# EXHIBIT A



# DIGITAL ASSET PURCHASE AND STRATEGIC REPRESENTATION AGREEMENT

This is a private commercial sale transaction between two principals and should not be construed as a solicitation or offer of Funds or Securities as defined by the Securities Act 1933/34.

| BITCOIN SELLER/SUPPLIER | |
|---|---|
| COMPANY NAME | CORONA BALCAZAR GERARDO |
| COMPANY ADDRESS | Blvd. Puerta de Hierro 5153, Col. Puerta de Hierro, Fracc. P. Andares, Zapopan, Jalisco. C.P. 45116. |
| COMPANY JURISDICTION | MEXICO, CDMX |
| COMPANY REGISTRATION NUMBER | PRIVATE CORPORATE ATTORNEY |
| SELLER'S AUTHORIZED SIGNATORY | CORONA BALCAZAR GERARDO |
| SIGNATORY PASSPORT | G20546745 |
| SIGNATORY COUNTRY OF ISSUE | MEXICO |

| BITCOIN BUYER | |
|---|---|
| NAME | Mr. Howard Ehrlich |
| ADDRESS, COMPANY, AND JURISDICTION | **Axis Capital Management Inc.**, a corporation organized in the State of Wyoming, with registered address at 1712 Pioneer Ave, Ste 500, Cheyenne, WY 82001, Tax ID 39-4909822, |
| PASSPORT | A37214426 |
| COUNTRY OF ISSUE | EEUU United States Department of State |
| DATE OF ISSUE | 5 September, 2024 |
| DATE OF EXPIRY | 4 September, 2034 |



## CONSIDERING

WHEREAS, the mutual promises and covenants, warranties, terms and conditions contained herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the undersigned PARTIES agree and declare that they wish to enter into this Agreement to exchange **FIAT** for **BITCOIN (BTC)** under the terms and conditions established here.

WHEREAS, **FIAT**-PROVIDER and **BTC**-PROVIDER present the legal information and warrant, under penalty of perjury under the laws of the applicable jurisdiction, that both **FIAT** and **BITCOIN** funds are derived from legal sources and not any illegal drugs. trafficking or money laundering activities, terrorist groups or associations, and or any other criminal activity, and confirm that the funds are good, clean, of non-criminal origin, free of liens and taxes, **BTC** freely transferable to be exchanged for **FIAT**.

WHEREAS, the Parties shall comply with all applicable laws and requirements established in relation to anti-terrorism laws in the world. FIAT-PROVIDER and **BTC**-PROVIDER agreed not to participate in related actions with any money laundering, and that each party, individually and separately, accepts the obligation to pay all taxes, duties, or import duties that may apply to it during the performance of its obligations in the transaction.

# DIGITAL ASSET PURCHASE AND STRATEGIC REPRESENTATION DIGITAL ASSET PURCHASE AND STRATEGIC REPRESENTATION AGREEMENT

## PARTIES

This Digital Asset Purchase and Strategic Representation Agreement (the "Agreement") is entered into by and between:

1. **Gerardo Corona Balcázar**, acting as Legal Representative of **Limitless Asset Management (LAM)**, with principal operations in Guadalajara, Jalisco, Mexico (hereinafter referred to as the "Seller");

2. **Axis Capital Management Inc.**, a corporation organized in the State of Wyoming, with registered address at 1712 Pioneer Ave, Ste 500, Cheyenne, WY 82001, Tax ID 39-4909822, **represented by Mr. Howard Ehrlich**, Passport No. A37214426 (Issue Date: 5 September 2024), Email: howie@legaluxpllc.com, Phone: 301-204-5697 (hereinafter referred to as the "Buyer").

## ARTICLE 1 – PURPOSE

The purpose of this Agreement is to establish the legal, commercial, and operational framework for the private sale of Bitcoin (BTC) by Seller to Buyer, including structured coordination of digital asset transactions and wallet assignment.

## ARTICLE 2 – DIGITAL ASSET SOURCE AND REPRESENTATIONS

2.1 Seller represents and warrants that the Bitcoin (BTC) sold under this Agreement originates exclusively from proprietary mining operations and is free from third-party custodial claims.
2.2 Seller affirms lawful ownership and operational control of the primary BTC wallet:
https://www.blockchain.com/explorer/addresses/btc/bc1qm34lsc65zpw79lxes69zkqmk6ee3ewf0j77s3h
2.3 Seller warrants that all digital assets transferred shall be free of liens, encumbrances, sanctions restrictions, or competing ownership claims.

**Limitless Asset Management**

## ARTICLE 3 – INITIAL TRANSACTION PARAMETERS

3.1 Minimum activation transaction: 25 BTC equivalent in USDT.
3.2 Maximum initial transaction: 100 BTC equivalent in USDT.
3.3 Accepted payment method: USDT (TRC-20 or ERC-20) unless otherwise agreed in writing.
3.4 BTC shall be released only after confirmed receipt of cleared USDT funds.

## ARTICLE 4 – COMMERCIAL TERMS AND DISCOUNT STRUCTURE

### GROSS DISCOUNT STRUCTURE AND ALLOCATION

4.1 Gross Transaction Discount

Upon confirmation of receipt of cleared USDT funds equivalent to a minimum of twenty-five (25) BTC and up to one hundred (100) BTC, a gross transaction-level discount equivalent to twenty percent (20%) shall be applied to the transaction. For purposes of clarity, the twenty percent (20%) represents the total commercial discount at settlement (the "Gross Discount").

4.2 Allocation of Gross Discount
The Gross Discount shall be distributed as follows:
a) Ten percent (10%) shall be allocated to Axis Capital Management Inc., as Buyer under this Agreement; and
b) Ten percent (10%) shall be allocated to Mr. Burl Shepard, acting as Chief Executive Officer of Westar, pursuant to the pre-existing commercial representation and procedural structure.

4.3 Mechanism of Application
The full twenty percent (20%) Gross Discount shall be reflected at the transaction level at the time of settlement and shall become effective only after:
i. Confirmation of cleared USDT funds (25–100 BTC equivalent); and
ii. Granting of operational control of the designated wallet in accordance with Article 5 of this Agreement.

4.4 No Additional Commission
The Buyer shall have no additional commission obligation beyond the structured allocation expressly described herein. The internal distribution between Westar and Axis Capital shall not affect the net transactional execution mechanics.

## ARTICLE 5 – WALLET ASSIGNMENT AND OPERATIONAL CONTROL

5.1 Seller shall assign a designated BTC wallet structure funded with approximately 39,704 BTC for operational use under this Agreement.
5.2 Buyer receiving wallet address for coordination purposes:
https://www.blockchain.com/explorer/addresses/btc/bc1qhk0ghcywv0mlmcmz408sdaxudxuk9tvng9xx8g
5.3 To obtain physical-level control of the assigned wallet, Buyer must provide:
• Copy of a valid passport
• Active email address
• Active phone number
• IP address of the same phone device
5.4 Upon receipt of the required documentation, Seller's technical team shall register the Buyer's credentials within the designated wallet infrastructure. All technical instructions and next steps shall be transmitted via email.
5.5 Seller (LAM) shall subsequently contact Buyer directly to coordinate operational use and management of the wallet.

## ARTICLE 6 – BUYER PROTECTIONS AND INDEMNIFICATION

6.1 Seller shall indemnify and hold harmless Buyer against any third-party claims arising from defective title, unlawful origin of assets, or misrepresentation regarding wallet ownership.

**Limitless Asset Management**

6.2 Failure to deliver BTC after confirmed receipt of funds shall constitute a material breach.

## ARTICLE 7 – GOVERNING LAW AND JURISDICTION

7.1 For U.S.-based transactions, this Agreement shall be governed by the laws of the United States.
7.2 For European-based transactions, this Agreement shall be governed by applicable EU commercial law.

## ARTICLE 8 – TERM AND TERMINATION

This Agreement becomes effective upon signature and remains valid unless terminated in writing.

### TERM OF AGREEMENT:

This Contractual Agreement is a full-recourse commercial commitment enforceable under the laws of the jurisdiction of the country of closing of the Transaction as applicable, and such law shall govern the interpretation, applicability, performance, execution, validity, and any other similar matters relating to this Agreement.
This procedural framework shall extend for an indefinite period, commencing upon the execution of the Initial Transaction, and shall govern all subsequent transactions introduced by Westar to LAM unless otherwise amended in writing by both parties. This Agreement is in full force and effect until the completion of the transaction and is legally binding on the parties, signatories, their heirs, successors, and assigns, agents, directors, attorneys, and all associated parties involved in this Agreement. The obligations of each party hereunder (generally and with respect to each tranche to be closed hereunder) are conditioned upon the following: The party is satisfied with the due diligence of the other party at all times; The performance of your obligations hereunder, without contravening or being restricted by any applicable law or regulation; and except in relation to the first tranche below, the successful completion of the preceding tranche.

### TAXES AND COSTS:

Both parties hereto individually and separately accept responsibility for any taxes, levies, duties, or charges that may be applicable in the performance of the independent functions of this transaction.

### NON-DISCLOSURE AND NON-CIRCUMVENTION:

All parties must be bound by and comply with the rules of non-circumvention and non-disclosure of all matters of the latest edition of the ICC, which will apply to this transaction, whether direct or indirect.

### CONFIDENTIALITY:

Disclosure of Confidential Information: The Parties acknowledge and agree that the existence of this Agreement, the terms of this Agreement and any other information disclosed in Seller's DD Materials, Buyer's DD and inspection reports, or any other documents, materials, data or other information regarding the Assets or the Business that is not generally known to the public will be kept confidential and the Parties agree that they will not disclose such information to any person or entity, except their respective attorneys, shareholders, directors, lenders, advisors, consultants or employees or otherwise as required by applicable law or already in the public domain.

### PUBLIC ANNOUNCEMENTS:

Neither Party shall have the right to make any public announcement or disclosure regarding the transactions described in this Agreement without the prior approval of the other Party. Seller and Buyer shall approve the timing, manner, and substance of such public announcement or disclosure, which approval shall not be unreasonably withheld, conditioned, or delayed, except if a Party is required to make a public announcement or disclosure under Applicable Law. In which case, such approval by the other Party will not be required.



## FORCE MAJEURE:

The "FORCE MAJEURE" exception clause of the International Chamber of Commerce is incorporated and forms an integral part of this Agreement.

No Party shall be liable or responsible to the other Party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations to make previously owed payments to the other Party hereunder) when and to the extent such failure or delay is caused by or results from acts beyond the impacted Party's ("Impacted Party") reasonable control, including, without limitation, the following force majeure events ("Force Majeure Event(s)") that frustrates the purpose of this Agreement:

(a) Acts of God;

(b) Flood, fire, earthquake, or explosion;

(c) War, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest;

(d) Government order or law;

(e) Actions, embargoes,s or blockades in effect on or after the date of this Agreement;

(f) Action by any governmental authority;

(g) National or regional emergency;

(h) Strikes, labor stoppages, slowdowns, or other industrial disturbances;

(i) Epidemic, pandemic, or similar influenza or bacterial infection (which is defined by the United States Centers for Disease Control as virulent human influenza or infection that may cause a global outbreak, pandemic, or serious illness);

(j) Emergency state;

(k) Other similar events beyond the reasonable control of the Impacted Party.

## OPTIONAL TERMINATION

Payment and Release Irrespective of any extension of time, if an Event of Force Majeure occurs and its effect continues for a period of 180 days, either party may give to the other a notice of termination, which shall take effect 30 days after the giving of the notice.

If the effect of the Force Majeure continues after the [30]-day period, the Contract shall terminate. After termination under this Sub-Clause, the parties shall comply with the Sub-Clause and pay the amount calculated to be owed to either party.

However, if the parties wish to resume obligations, they ought to give written notice of their intention within thirty 30 days of the conclusion of the Force Majeure Event.



### ASSIGNMENT:

A Party shall not be entitled to assign all of its rights and obligations under this Agreement as an indivisible whole (provided that it includes any liability under this Agreement that may have arisen before such assignment) without the prior written consent of the other Party. be entitled to assign all of its rights and obligations under this Agreement as an indivisible whole (provided that it includes any liability under this Agreement that may have arisen before such assignment) without the prior written consent of the other Party. A Party shall not be entitled to assign all of its rights and obligations under this Agreement as an indivisible whole (provided that it includes any liability under this Agreement that may have arisen before such assignment) without the prior written consent of the other Party.

### CONSULTING FEES:

All consulting fees are transferred to PAYMASTER, and a Certificate of Acceptance and Transfer of Guarantee is signed.

### CHAIN TRANSACTIONS:

The transfer of bitcoins provided under this agreement shall take place on-chain and refer to cryptocurrency transactions that take place on the blockchain, which depend on the state of the blockchain for their validity. On-chain transactions are considered valid only when the blockchain is updated to reflect the minimum number of verifications, which shall not be less than 6 verifications.

We, as a Seller, will always encourage any Buyer to accept our procedures. We will take any necessary action from the Buyer to provide a positive relationship and ensure this is a successful transaction.

### SPECIAL SECURITY CLAUSE.

The buyer declares that in case of misuse of the Satoshi sent by the seller, such as hacking of the wallet, attempted cyber-breach or any act considered illegal by the buyer or third parties such as banks, insurance companies or private persons, will be subject to the corresponding international criminal penalties, in addition to the payment of damages and moral damages that will be quantified at the time of quantification by the legislative authority, it will be his full responsibility.

Likewise, any cyber-attack that occurs to the seller's wallet due to the sending of the Satoshi random fraction to initiate operations for a minimum amount of $50 or higher that the programming in the system shows and that is required to trigger the purchase and sale operation of the present contract, will be constituted as a crime that will be denounced before the International Police (INTERPOL) and the maximum punishment that the international laws allow will be sought by the International Courts that know about it.

### NON-PERFORMANCE PENALTY:

THERE IS A PENALTY OF USD 1,000,000.00 FOR BREACH BY EITHER PARTY FOR THE FOLLOWING CONDITIONS:

A breach of this agreement includes, but is not limited to, the following:

a.      Either party's failure to pay any amount hereunder, which is more than three (3) days past the due date agreed on by the parties, without justified cause or notice of any anticipatory breaches.

**Remedies for breach**; In the event of any breach of this agreement by either party, the non-breaching party shall be entitled to seek any remedies available under law or equity, including but not limited to damages, specific performance, mediation, arbitration, and injunction.

# ⋀⋀Limitless Asset Management

## SIGNATURE ENDORSEMENT:

IN WITNESS WHEREOF, the undersigned has read this document and has been informed of its legality, and after understanding the contents of this Agreement written in the English language, by knowledge of the language or by professional translation into the language of the party, and with legal advice, and initialed all pages of this Agreement. Furthermore, I fully understand and agree that its execution constitutes an acceptance of all its covenants, terms, and mutual protection obligations of the parties.

| | |
|---|---|
| **BY THE AUTHORIZED SIGNATORY OF THE BITCOIN (BTC) SELLER** | Gerardo Corona Balcazar |
| COMPANY NAME | Private Corporate Attorney |
| ADDRESS | Blvd. Puerta de Hierro 5153, Col. Puerta de Hierro, Fracc. P. Andares, Zapopan, Jalisco. C. P. 45116 |
| **SPECIAL INSTRUCTION** | This Agreement is dated as of the date written above and has been entered into as of that date by the duly authorized representatives of the Parties as set forth below: Upon signing this Agreement, we agree to begin the transaction as arranged between Buyer and Seller. |

**Date: FEBRURY 11th, 2026**

Seller signature:_____

Title: LEGAL REPRESENTATIVE OF LAM
Passport number: G20546745 Date of
issue: 03/05/2016
Expiration date: 02/05/2026



# ⟪Limitless Asset Management

## (hereinafter referred to as the "Buyer").

| Represented by | Howard Ehrlich |
|---|---|
| Passport Number | A37214426 |
| Passport Issue Date | 5 September 2024 |
| Company Name | Axis Capital Management Inc. |
| Company Address | 1712 Pioneer Ave, Ste 500, Cheyenne, WY 82001 |
| Tax ID | 39-4909822 |
| Email | howie@legaluxpllc.com |
| Phone Number | 301-204-5697 |

**Date: FEBRURY 11th, 2026**

Buyer signature:_____

Name: Howard Ehrlich
Passport number: A37214426
Date of issue: 5 September 2024
Expiration date: 4 September 2034



ELECTRONIC SIGNATURE IS VALID AND ACCEPTED AS A HAND
SIGNATURE

EDT (ELECTRONIC DOCUMENT TRANSMISSIONS) SHALL BE DEEMED VALID AND ENFORCEABLE IN RESPECT OF ANY PROVISIONS OF THIS CONTRACT. AS APPLICABLE, THIS AGREEMENT SHALL BE:

✓ INCORPORATE U.S. PUBLIC LAW 106-229, "ELECTRONIC SIGNATURE IN GLOBAL AND NATIONAL COMMERCE ACT" OR SUCH OTHER APPLICABLE LAW CONFORMING TO UNCITRAL MODEL LAW ON ELECTRONIC SIGNATURES (2001) AND ELECTRONIC COMMERCE AGREEMENT (ECE/ TRADE/257, GENEVA, MAY 2000) ADOPTED BY THE UNITED NATIONS CENTRE FOR TRADE FACILITATION AND ELECTRONIC BUSINESS (UN/CEFACT).

✓ EDT DOCUMENTS SHALL BE SUBJECT TO THE EUROPEAN COMMUNITY DIRECTIVE NO. 95/46/EEC, AS APPLICABLE. EITHER PARTY MAY REQUEST A HARD COPY OF ANY DOCUMENT THAT HAS BEEN PREVIOUSLY TRANSMITTED BY ELECTRONIC MEANS. PROVIDED, HOWEVER, THAT ANY SUCH REQUEST SHALL IN NO MANNER DELAY THE PARTIES FROM PERFORMING THEIR RESPECTIVE OBLIGATIONS AND DUTIES UNDER EDT INSTRUMENTS.

## ***END OF THE DOCUMENT***

# EXHIBIT B

# Limitless Asset Management

México, 16 de febrero de 2026.

Suspensión temporal de operaciones por evento de ciberseguridad.

Informamos a nuestros clientes, inversionistas, público y sociedad que hemos detectado un intento de acceso no autorizado a ciertos componentes de nuestra infraestructura tecnológica. De acuerdo con lo establecido en nuestro Plan de Respuesta a Incidentes, así como a estándares internacionales de seguridad de la información, hemos puesto en marcha de inmediato nuestras medidas de contención, de monitoreo avanzado y de análisis forense especializado.

Queremos subrayar de forma contundente lo siguiente:
- Las wallets de resguardo están protegidas.
- Los activos digitales bajo custodia están asegurados.
- Nuestros sistemas de almacenamiento en frío (cold storage) y nuestros esquemas de firma múltiple (multi-signature) no han sido vulnerados.

La investigación técnica está en curso con el acompañamiento de un equipo especializado de ingenieros alemanes en ciberseguridad, quienes ya están trabajando en el análisis forense, validación de infraestructura y endurecimiento de los sistemas de protección.

Las medidas que hemos adoptado incluyen:
- Aislamiento preventivo de nodos y servidores críticos.
- Auditoría de accesos y credenciales administrativas.
- Reforzamiento de estrictas capas de autenticación y monitoreo en tiempo real.
- Validación de integridad en la infraestructura de custodia digital.

Al mismo tiempo, como consecuencia de nuestro compromiso con la transparencia y la relación de confianza que mantenemos con nuestra comunidad, queremos informar que los clientes que hayan resultado afectados y cuyo proceso se haya visto interrumpido por la dicha suspensión recibirán un beneficio descuento adicional del 3% que se corresponde con el porcentaje que ya habían acordado, siendo aplicado conforme a nuestros estándares y términos operativos vigentes a en la fecha de reactivación.

Esta suspensión resulta ser una medida preventiva orientada a mantener la protección de los activos digitales y la confianza de nuestra comunidad.

Agradecemos su comprensión y ratificamos nuestro compromiso con la transparencia, la seguridad tecnológica y la protección de los fondos bajo nuestra custodia.

Atentamente

Steve Norton
CEO

# EXHIBIT C

**Limitless Asset Management**

# ADDENDUM NO. 1
# TO THE DIGITAL ASSET PURCHASE AND STRATEGIC REPRESENTATION AGREEMENT

This Addendum No. 1 (the "Addendum") is entered into as of February 21, 2026, by and between the undersigned parties to that certain Digital Asset Purchase and Strategic Representation Agreement dated February 11, 2026 (the "Agreement").

This Addendum forms an integral and legally binding part of the Agreement. Except as expressly modified herein, all other terms and conditions of the Agreement remain unchanged and in full force and effect.

## 1. BACKGROUND AND PURPOSE

1.1 The Parties acknowledge that the original Agreement established the commercial and operational framework for the assignment and operational control of a designated Bitcoin (BTC) wallet structure funded with approximately 39,704 BTC, subject to the transaction mechanics, discount structure, and compliance provisions described therein.

1.2 Due to certain Force Majeure circumstances and technical operational delays beyond the reasonable control of the Parties, delivery of the designated wallet has experienced a delay. Both Parties acknowledge that such delay was not caused by willful misconduct or bad faith by either Party.

## 2. DELIVERY COMMITMENT

2.1 Mr. Wilson, Chief Executive Officer of Lamb Limited Assets Management (LAM), hereby formally commits that the designated wallet referenced in the Agreement shall be delivered to Mr. Howard ("Howie") Ehrlich President of Axis Capital Management, Inc, no later than Tuesday, February 24, 2026, before 5:00 PM Eastern Time (New York time). Mr. Steven Resnick, Vice President Axis Capital Management, Inc,, shall also act as proxy and with full authority on behalf of Axis Capital Management, Inc.

2.2 Upon delivery, the Buyer shall obtain full operational and administrative control of the wallet infrastructure in accordance with Article 5 of the Agreement.

## 3. UPDATED WALLET BALANCE

3.1 The Parties acknowledge that the wallet currently reflects approximately 40,700 BTC.

3.2 Seller has further committed to increasing the wallet balance by approximately 5,000 additional BTC, to be reflected within the designated wallet structure.

3.3 Buyer may transact up to 400 coins (previously 100 coins) per transaction and may transact and liquidate up to three (3) times daily in such amounts (up to a maximum of 1,200 coins daily)

**Limitless Asset Management**

## 4. ADDITIONAL DISCOUNT STRUCTURE

4.1 The original Agreement provides for a twenty percent (20%) Gross Discount, allocated as outlined in Article 4 of the Agreement.

4.2 Any potential modification, adjustment, or additional commercial consideration beyond the existing Gross Discount shall be subject to internal confirmation by Mr. Wilson in consultation with his executive partners. If approved, such an adjustment will be formally communicated in a separate written notice via official email. For the avoidance of doubt, this Addendum does not constitute a binding commitment to grant any additional specific percentage discount.

4.3 No commercial modification shall be deemed effective unless expressly confirmed in writing following executive review.

4.4 The fee to be allocated to Mr. Burl Sheppard, acting as Chief Executive Officer of Westar, modified from the pre-existing commercial representation and procedural structure shall be null and void. Such fee paid to Mr Burl Sheppard shall be determined between Axis Capital Management Inc and Mr Burl Sheppard by separate, written agreement and in addition, LAM shall not

4.5 The Parties Acknowledge that Axis Capital Management, Inc shall pay a fee directly to Mr Evan Sanchez and Mr Jose Ramos, each of which shall be determined in writing between the relevant parties named in this Section and shall not impact this Agreement in any manner whatsoever nor shall LAM have any influence over such separate arrangement.

## 5. REVENUE DISTRIBUTION CLARIFICATION

5.1 The Parties reaffirm that under the existing Agreement structure, eighty percent (80%) of monetized BTC shall be remitted to LAM and twenty percent (20%) shall remain with the Buyer as the originally structured discount allocation.

5.2 Any additional approved discount shall be applied independently and shall not invalidate the underlying revenue-sharing structure unless amended in writing.

## 6. NON-COMPLIANCE AND REMEDIAL OBLIGATION

6.1 If delivery of the wallet does not occur by February 24, 2026, before 5:00 PM Eastern Time, Seller shall return the total amount of BTC previously paid and settled, including the originally agreed discount, without prejudice to the continuation of the underlying Agreement.

6.2 This clause is intended as a protective mechanism for both Parties and does not constitute termination unless separately invoked under Article 8 of the Agreement.

**Limitless Asset Management**

## 7. RATIFICATION

7.1 This Addendum is executed in good faith and reflects the operational understanding reached between the Parties regarding delivery timing, updated wallet balance, and commercial adjustments.

7.2 Electronic signatures shall be deemed valid and enforceable in accordance with the provisions incorporated in the original Agreement.

IN WITNESS WHEREOF, the Parties execute this Addendum as of the date first written above.

**SELLER:**

**Gerardo Corona Balcázar**
Legal Representative of LAM

Signature: _____

**BUYER:**

**Howard Ehrlich, President**
Axis Capital Management Inc.

**Limitless Asset Management**

Signature: _____

**Limitless Asset Management**

# EXHIBIT D

 **Limitless Asset Management**

MEMORANDUM OF UNDERSTANDING

(Force Majeure Notice and Operational Reactivation Update)

Date: March 4, 2026

To:

Mr. Howard Ehrlich

President

Axis Capital Management Inc.

Subject: Formal Notice of Force Majeure, Corporate Restructuring Process, and Wallet Reactivation Timeline

Dear Mr. Ehrlich,

This Memorandum of Understanding ("MOU") is issued in good faith to formally document the circumstances that temporarily delayed the delivery of the private wallet assigned to your structure and to provide a comprehensive operational update regarding system reactivation and delivery scheduling.

1. Corporate Legal Restructuring Process

Approximately one week ago, LAM (Limit Assets and Management) initiated a formal internal legal restructuring process arising from a corporate legal matter requiring immediate compliance adjustments and governance reorganization.

As a precautionary and compliance-driven measure, certain operational components—including wallet issuance procedures—were temporarily placed under administrative review in order to preserve regulatory alignment, asset protection mechanisms, and structural integrity within LAM's operational framework.

2. Force Majeure Event – Jalisco, Mexico

At the time the wallet delivery was scheduled for final execution, an unforeseen force majeure event occurred in the State of Jalisco, specifically in Guadalajara, Mexico. The situation resulted in mobility restrictions, temporary business closures, security-related operational lockdowns, and restricted access to physical facilities.

Due to these extraordinary conditions, technical personnel were required to remain secured in residential locations, and certain secured facilities were temporarily inaccessible. As a result, internal infrastructure and operational coordination were interrupted.

3. Technical Architecture and Wallet Structure

LAM's operational infrastructure functions under the following architecture:

- A primary transactional master wallet operates as the central liquidity source.

- This master wallet feeds multiple secured cold wallets.

- These cold wallets distribute BTC allocations to private client wallets.

- The wallet assigned to your structure is one of these secured private wallets.

During remote validation testing procedures, certain controlled system diagnostics were conducted at the master-wallet level. These were internal stress-testing measures and do not represent any technical fault or irregularity.

We confirm that the wallet assigned to your structure is fully operational, insured, and structurally intact.

4. Mining Operations and System Reactivation

LAM operates continuous 24/7 mining infrastructure. During the temporary shutdown period, approximately 50% of mining throughput was affected due to security constraints and temporary infrastructure suspension.

Following stabilization, the technical department formally initiated full system reactivation. All internal systems are undergoing phased restart protocols inside the secured operational facility.

Effective tomorrow, after 12:00 PM (Mexico time), all private wallet systems will be fully reactivated and normal operational status will be restored.

A coordination meeting will be held today at 4:00 PM (Mexico time) between partners and the technical team to finalize operational checkpoints. Immediately following this meeting, a precise delivery hour will be confirmed.

5. Commitment and Good Faith

LAM remains fully committed to concluding this transaction phase without further delay. We sincerely appreciate your patience and professionalism during these exceptional circumstances.

Respectfully,

Gerardo Corona Balcázar

Legal Representative

LAM – Limit Assets and Management